UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
 - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

-v-
                                 Cr. No. 07-CR-14(DLI)

THOMAS QUALLS,
                                   09-CR-418(DLI)

            Defendant.

 - - - - - - - - - - - - - - X


**GOVERNMENT'S SENTENCING MEMORANDUM**


                        LORETTA E. LYNCH
                        United States Attorney
                        Eastern District of New York
                        271 Cadman Plaza East
                        Brooklyn, New York 11201


DANIEL A. SPECTOR
Assistant U.S. Attorney

1

PRELIMINARY STATEMENT & FACTUAL OVERVIEW

Thomas Qualls led International Foreign Currency ("IFC"), a firm which promised to invest clients' funds in foreign currency.  Qualls, and co-conspirators acting at his direction, lied to investors about virtually every aspect of IFC.  Qualls incorporated many of the fraudulent techniques he had used in two prior fraud schemes, Evergreen and Oxford Dundee, including a false promise to clients that their investments were protected by a $25 million insurance policy, and false assurances that investors' funds would be protected by a "stop loss" to minimize potential losses.  Once investors sent their funds to IFC, Qualls stole most of their money.  Qualls gave some of the stolen funds to his co-conspirators but spent the vast majority on himself.  Although Qualls did trade a portion of investor funds on the foreign exchange market, these trades ultimately resulted in deep losses, and at several points Qualls had lost all of the investors' money.  Qualls further deceived investors by creating fictitious account statements, falsely showing gains, when in fact all investor funds had been stolen by Qualls and lost in the market.

After the scheme collapsed, Qualls engaged in a pattern of obstructive conduct during the entirety of the

investigation and prosecution of this case.  When Qualls learned that law enforcement authorities were conducting a "search" of the IFC premises, he rushed to IFC and secreted a box of IFC customer account statements and other critical documents, which he later hid in his mother-in-law's house.  In response to a grand jury subpoena requesting these account statements, Qualls falsely claimed that the statements were "on a burnt computer" and therefore never provided any account statements to the government.  Qualls's obstructive gambit worked for over two years, until law enforcement authorities later obtained the box of documents Qualls had hidden at his mother-in-law's home.

Qualls continued his obstructive efforts through false statements in a deposition to the CFTC, lying about his role at Oxford Dundee, the nature of his IFC clients, and his theft of IFC client funds.  Qualls similarly made false and conflicting statements to law enforcement authorities when he was arrested.

Qualls's last and most dramatic act of obstruction occurred during the trial, when he fled shortly before the jury began deliberations.  The timing of Qualls's flight is yet another example of his consciousness of guilt:  the last witnesses before his flight were the government's two experts, who provided devastating evidence of both Qualls's fraud and his

theft of client funds.  Indeed, this evidence was so compelling
that the Court considered <u>sua</u> <u>sponte</u> remanding Qualls into
custody.[1]  As the government's investigation later revealed,
Qualls fled to Canada where he used a false passport in the name
"Zachary Lyons" to facilitate his flight.  He was eventually
apprehended in Montreal, Canada in March 2009, and spent the
next three years unsuccessfully contesting his extradition to
the United States, including a failed attempt to seek asylum in
Canada.

<u>SENTENCING ANALYSIS</u>

        In his sentencing submission, Qualls urges this Court
to calculate a Sentencing Guidelines range dramatically lower
than that set forth in the PSR, and further seeks a sentence of
four years imprisonment based on a variety of arguments.  For
the reasons set forth below, the Court should reject Quall's
arguments, and impose a sentence at the high end of the
applicable Guidelines range of 210-262 months.

---

        [1] On the morning when Qualls first failed to appear, the
Court immediately expressed concern, noting "I had the
inclination to put him in on Friday, or Thursday".  (Tr. 1815).

4

I.   Guidelines Calculation

Because the criminal conduct for which Qualls was convicted at trial ended in August 2003, the government had initially concurred in Qualls's objection to applying the 2013 Guidelines Manual, and instead agreed that the 2002 Guidelines Manual should apply, to avoid violation of the Ex Post Facto Clause of the United States Constitution.  In response, the Probation Department noted in the Addendum to the PSR that Policy Statement 1B1.11(b)(3), the so-called "One Book Rule" provides that where, as here, a "defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual becomes effective, the revised edition of the Guidelines Manual is to be applied to both offenses."  PSR Addendum, at 2 (citing Guidelines Policy Statement 1B1.11(b)(3)).  Here, the defendant's most recent offense, bail jumping, was committed on November 3, 2008. Therefore, the One Book Rule provides that the Guidelines Manual in effect as of November 2008 should apply to the calculation of the Guidelines range for all of Qualls's offenses.  Because there has been no change between November 2008 and the present in any of the Guidelines applicable to Qualls, the 2013 Guidelines Manual should apply.

5

After careful consideration and consultation with the
Appeal Division of the United States Attorneys Office, the
government respectfully submits that the Probation Department is
correct, and that the 2013 Guidelines Manual should apply here.
Indeed, the Second Circuit has directly spoken on this question,
holding that "the one-book rule set forth in § 1B1.11(b)(3) does
not violate the Ex Post Facto Clause when applied to the
sentencing of offenses committed both before and after the
publication of a revised version of the Guidelines." United
States v. Kumar, 617 F.3d 612, 628 (2d Cir. 2010).[2] Therefore,
this Court should reject the defendant's Ex Post Facto challenge
to the application of the 2013 Guidelines Manual.  The correct
Guidelines calculation, as set forth in the PSR, is as follows:

    Base Offense Level  (2B1.1(a)(1))                7

    Plus: Loss Over $400,000 (2B1.1(b)(1)(H)       +14

    Plus:  More than 10 Victims (2B1.1(b)(2)(A))    +2

---

[2] Nothing in the recent Supreme Court case of Peugh v.
United States, 569 U.S. __ (2013), 133 S.Ct. 2072 alters this
analysis.  As discussed below, Peugh merely held that the Ex
Post Facto Clause is applicable to the Guidelines – a
presumption shared by the court in Kumar.  See Kumar, 617 F.3d
at 624 (noting that "a 'sentencing court must generally apply
the version of the Guidelines that is in effect at the time of
sentencing, unless there is an ex post facto problem' with such
application.")(internal citations omitted).

```
Plus:   Sophisticated Means (2B1.1(b)(10))      +2

Plus:   Commodities Broker (2B1.1(b)(18))       +4

Plus:   Leader/Organizer (3B1.1(a))             +4

Plus:   Obstruction of Justice (3C1.1)          +2

Total Offense Level:                            35
```

This offense level carries a sentencing range of 210-262 months, based on a Criminal History Category of III.

A.   Qualls's Objections to the Guidelines
     Calculation Should be Rejected_____

Qualls raises a series of objections to the Guidelines calculation set forth above, all of which lack merit.

1.   Loss Calculation

First, Qualls argues that the two largest single deposits with IFC, made by Roger Steele and Alexander Perumal, for a combined total of $450,000, should not be included in the loss calculation.  Qualls provides no reason for this position, other than a bald assertion that "the government has not provided sufficient evidence of the source and purpose" of these funds.  Qualls Sentencing Memorandum (hereinafter "Sent. Memo"), at 21.  This claim is baseless. The record at trial established that the only purpose for which funds were provided to IFC by

7

investors was for foreign currency investment.[3]  Qualls's claim should therefore be rejected.

## 2.   Sophisticated Means

Qualls next challenges the enhancement for sophisticated means pursuant to U.S.S.G. § 2B1.1(b)(10).  Qualls argues that the false account statements were "replete with errors that the investors could easily identify on their face." Sent. Memo, at 22. This claim is belied by the record, which showed that each investor believed and relied on the account statements.  Indeed, as the investors lacked access to IFC's IG Markets trading account, the fictitious IFC account statements were investors' sole source of information concerning their account.  Several investors, including Oostvogels and Stevenson,

---

[3] In his objections to the PSR, Qualls argued, again without any evidentiary basis, that the funds provided by these two investors were used for unspecified "unrelated business activities."  Qualls now appears to retreat from that claim. See Sent. Memo, at 21, n.6.  In any event, contrary to Qualls's claim, the government introduced into evidence at trial an IFC customer account statement for Steele's company, Impetus, reflecting an opening balance of $350,000. (Tr. 747-48).

increased their own investments with IFC based on the account statements.[4]

### 3.  Leadership Role

Qualls next argues that he was not the leader of the IFC scheme, but merely one of four partners with "different, equally culpable roles." Sent. Memo, at 23.  In support of this claim, Qualls relies heavily on the early stages of IFC, in which he claims the four partners agreed upon an equal partnership, in which profits would be split evenly.  This rendition of the facts, however, omits critical aspects of these early stages.  From the genesis of the scheme, Qualls established himself as the clear leader, directing Catalano regarding IFC's paperwork, and running the first meeting between Catalano, Hirschorn and Maggio.  (Transcript of Trial (hereinafter "Tr."), at 955-56, 961, 974).[5]  Moreover, even at the beginning of the scheme, Qualls did not share the profits with his partners equally, but instead took most of the profits for himself without their knowledge.  (Tr. 983).

_____

[4] Qualls also argues that the false account statements were the product of [redacted]. This argument will be addressed below.
[5] Pages of the trial transcript cited herein are attached hereto as Exhibit 1.

9

In any event, the early stages of the fraud were just one aspect of the scheme.  The evidence at trial demonstrated that Qualls was the leader of IFC, and controlled every aspect of the company and the criminal scheme.[6]  Several investors, including Mattarano and Oostvogels, understood Qualls to be the "boss" or "manager" of IFC.  (Tr. 47, 166, 212).  IFC employees also universally recognized Qualls as the leader of IFC.  Talin Gebbia, the IFC secretary, testified that Qualls was in charge of the company, and supplied her with the text of letters to be sent to clients (Tr. 368-69, 379-80).

Gebbia further testified that Qualls "definitely" held a higher rank than Catalano at IFC.  Catalano's role appeared to be "simply take office space. . .watch TV, walk around the office, maybe make a phone call."  (Tr. 373).  Indeed, during his post-arrest statements, Qualls confirmed the vast difference between him and Catalano, noting that "Joe Catalano had no prior

_____

[6] Qualls also described himself as the president of Oxford Dundee in a deposition to state banking regulators (Tr. 315, 323).  Similarly, in a deposition taken by the Commodities Futures Trading Commission ("CFTC"), Qualls described his supervisory role over the Oxford Dundee brokers, which included monitoring brokers' phone calls with investors.  (Tr. 282-83).  Indeed, some IFC promotional materials, including the false claim of a "$25 million insurance" on IFC investments, were identical to those used at Oxford Dundee.  Qualls also designed the logo for the IFC brochure sent to clients.  (Tr. 384, 1000).

experience in foreign currency trading and that Mr. Qualls taught Joe Catalano everything he kn[e]w on foreign currency trading." (Tr. 779-80). Furthermore, Catalano testified that although he was nominally a partner in IFC, Qualls directed virtually every aspect of the enterprise. (Tr. 955-56; 970, 974-75).[7]

Michael Kourmolis, one of the IFC brokers, testified that Qualls was in charge of IFC's funds and that, although Catalano was a partner at IFC, "Tom was basically the principal." (Tr. 520). Similarly, Dimitrios Papadoniou, another IFC broker, testified that Qualls was the owner and "ultimate boss" at IFC, and that, in a meeting with an IFC client, Qualls held himself out as the owner and President of IFC. (Tr. 1256, 1314). Although Hirschorn and Maggio also held leadership roles by managing the brokers, they were subordinate to Qualls, and both left shortly after the fraudulent scheme began. (Tr. 522, 1261). Similarly, Catalano left during the course of the scheme, leaving Qualls as the sole IFC principal. (Tr. 1015).

---

[7] In addition, Catalano's testimony clearly demonstrated his lack of sophistication. (Tr. 1044, 1062-63).

11

Qualls also gave detailed instruction to brokers to help them perpetrate the fraud.  For example, Qualls told brokers to modify their "pitch" to European clients to include the Euro, which would be more enticing to European investors. (Tr. 523, 609).  Qualls also helped brokers "close" investments with potential clients, feeding them lines to repeat to the clients.  Id.

Qualls also controlled the finances of IFC.  Each IFC employee who testified at trial testified that Qualls, and Qualls alone, conducted the trading for IFC. (Tr. 367-68, 520, 551, 563, 994-97, 1257-58.[8]  Qualls also held exclusive control over the flow of funds to and from IFC.  (Tr. 388, 538). Furthermore, Qualls was the only person who created the false customer account statements, one of the most critical aspects of the fraud.  (Tr. 388, 540-41, 780, 1012-13, 1459-60; 1579).  As the government's expert witness, Dr. David DeRosa, definitively established at trial, Qualls falsified these account statements, often making them up from whole cloth to reflect false profits

_____

[8] Indeed, Catalano described the one isolated instance in which he traded the IFC account, after receiving permission to do so from Qualls.  Catalano found the experience so difficult and stressful that he vomited afterwards, and never made any trading decisions again.  (Tr. 998-99).

when IFC had lost money, or, in some cases, where no trading at all had occurred.  (Tr. 1459-60, 1579).

In short, the government presented overwhelming evidence at trial that Qualls was the leader of the fraud scheme, and therefore the four-point enhancement pursuant to U.S.S.G. § 3B1.1(a) should apply.[9]

B.    Neither Peugh nor Alleyne are Applicable Here

Qualls next argues that two recent Supreme Court cases, Peugh v. United States, 569 U.S. __ (2013), 133 S.Ct. 2072 and Alleyne v. United States, 570 U.S. __ (2013), 133 S.Ct. 2151 together have undermined the "Booker remedy" such that the government is now required to prove to a jury beyond a reasonable doubt any fact which would result in an increase in the Guidelines calculation.  Those cases, however, were far more limited in scope.  Peugh held that the Ex Post Facto Clause precludes the application of a higher Guidelines range than was in effect at the time a defendant committed the crime; Alleyne

_____

[9] Qualls also erroneously asserts that Hirschorn did not receive a role adjustment for his participation in the offense. In fact, Hirschorn received a three point adjustment for his role in managing the IFC brokers, but was nonetheless clearly subordinate to Qualls in the scheme.  See United States v. Hirschorn, 07-CR-268 (DLI), Government Sentencing Submission, Docket Entry 15 (noting that Hirschorn "undertook a supervisory role at IFC.").

13

held that any fact which increases a defendant's statutory

minimum must be submitted to a jury and proven beyond a

reasonable doubt.

Indeed, Qualls's argument is foreclosed by the very

cases he cites, which explicitly rejected his argument:

> Finally, the Government contends that a rule
> that the Ex Post Facto Clause is violated by
> the application of an increased Guidelines
> range would be in tension with this Court's
> post- Booker cases and, indeed, would
> "largely undo ... the Booker remedy" for the
> Sixth Amendment violation found there. If
> the Guidelines are binding enough to trigger
> an ex post facto violation, the argument
> goes, then they must be binding enough to
> trigger a Sixth Amendment violation as well.
> The Government's argument assumes that the
> Sixth Amendment and the Ex Post Facto Clause
> share a common boundary; that only where
> judge-found facts are the basis of a higher
> sentence in a manner that raises Sixth
> Amendment concerns can a set of sentencing
> rules be sufficiently determinate to run
> afoul of the Ex Post Facto Clause. But the
> Sixth Amendment and Ex Post Facto Clause
> inquiries are analytically distinct. . . .
> Nothing that we say today "undo[es]" the
> holdings of Booker, Rita, Gall, Kimbrough,
> or our other recent sentencing cases.

Peugh, 133 S.Ct. 2087-88.

The Court similarly limited its holding in Alleyne:

> We take care to note what our holding does
> not entail.  Our ruling today does not mean
> that any fact that influences judicial
> discretion must be found by a jury. We have

> long recognized that broad sentencing
> discretion, informed by judicial
> factfinding, does not violate the Sixth
> Amendment.

Alleyne, 133 S.Ct. 2164.

The Supreme Court thus made clear that neither Peugh nor Alleyne have undermined the "Booker remedy."  The Court should therefore decline Qualls's invitation to hold the Guidelines unconstitutional based upon these cases.

   C.   There is No Basis to Reject the Application
        of the Guidelines Here as a "Policy Matter"

Perhaps anticipating that his Guidelines arguments are doomed to failure, Qualls next urges the Court to simply disregard the Guidelines altogether, arguing that the fraud Guidelines have been unjustifiably "inflated" since 2002, and that the combination of "specific offense characteristics and other enhancements overstates the level of Mr. Qualls's criminal culpability."  Sent. Memo, at 29.

Qualls begins this argument with a citation to a recent Second Circuit case, United States v. Corsey, 723 F.3d 366, 377 (2d Cir. 2013), in which a concurring judge characterized the loss Guidelines as "fundamentally flawed."  A close reading of Corsey, however, reveals that it is distinguishable from the instant case and illuminates a

15

fundamental flaw, not with the Guidelines but rather Qualls's analysis.  Corsey involved a defendant who engaged in what the court characterized as a "ridiculous" fraud involving "a purported coalition of Buryatian nationals and Yamasee tribesmen using AOL email accounts to offer five billion dollars in collateral for a loan to build a pipeline across Siberia."  723 F.3d at 377.  The target of the scam, who quickly recognized that "the deal smelled" only continued to pursue the transaction because he was working as an informant for the government.  Id., at 369-70.  Under these circumstances, the Second Circuit recognized "the low risk that any actual loss would result" and expressed concerns that the district court had not sufficiently considered whether the Guidelines, which called for a life sentence, overstated the seriousness of the offense.  Id., at 377.

Unlike Corsey, the fraud in the instant case was all too real.  Numerous victims were defrauded of hundreds of thousands of dollars.  Qualls created a glossy brochure, utilized cold-callers who were experienced in deceiving investors, and created fraudulent account statements -- all part of his successful endeavor to defraud real victims of real money.  As discussed in more detail below, victims of the

16

offense continue to suffer the deleterious effects of Qualls's
fraud.  The instant case is thus a far cry from the fraud in
Corsey, which had virtually no possibility of causing actual
harm to anyone.

Qualls's reliance upon Corsey, as well as United
States v. Adelson, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), is
misplaced for another reason:  whereas those cases involved
astronomical losses, the loss here is less than $1 million,
yielding a substantially lower offense level than the life
sentences called for under the Guidelines in Corsey or Adelson.
In this regard, it is significant to note that while Qualls
argues that the 2002 Guidelines should apply, the enhancement
for the loss level applicable here has remained unchanged from
2002 through the present.  Qualls's argument on this point
therefore rings hollow.

Furthermore, as the concurrence in Corsey notes, a
relatively low loss figure does not necessarily bespeak a lack
of seriousness:

> [N]ot all actual loss is equally serious. A
> fraud that results in the loss of even a few
> thousand dollars by an elderly or sick
> person who, as a result of the loss, becomes
> unable to afford the necessities of life or
> medical care is much more serious than a
> fraud that results in ten or a hundred times

> that loss by a large corporation able to
> absorb the financial consequences. . .

Corsey, at 381.  Qualls's fraud clearly falls within the former
category.  As noted in the PSR, one victim is a disabled,
unemployed single parent, and as a result of the fraud was
unable to support another ill family member.  PSR, ¶ 57.  This
victim described her experience with Qualls and IFC as
"destructive, distressing, demoralizing as well as devastating."
Id.  Similarly, another victim was an 88 year-old retiree who
lives on a government pension and invested a significant portion
of her life savings with Qualls.  PSR, ¶ 58.  As a result of the
fraud, her "mental and physical condition" has deteriorated such
that she is "under permanent medical supervision, causing a
tremendous amount of stress."  Id.

It is for these reasons, as well as the other
particular circumstances of the instant case, that Qualls's
"policy" attack upon the cumulative effects of the sentencing
enhancements fails as well.  Indeed, if anything, the Guidelines
understate the seriousness of Qualls's offenses.  Although
Qualls has a criminal history category of III, he was never
charged for some of his most serious prior criminal schemes, and
therefore these crimes are not reflected in his criminal

history.  As the record at trial demonstrated, Qualls participated in a fraudulent chimney-cleaning scheme with Catalano, worked as a cold-caller for the Evergreen fraudulent currency scheme, and operated a fraudulent scheme at Oxford Dundee that was virtually identical to IFC.  If Qualls had been convicted of even one of these crimes, his criminal history would be substantially higher.

Second, Qualls's remarkably extensive pattern of obstruction is inadequately reflected in the Guidelines calculation.  As noted in the PSR, Qualls committed multiple instances of obstructive conduct, each of which could constitute an independent basis for the two-level enhancement under U.S.S.G. § 3C1.1: (1) Qualls's concealment of documents in response to a grand jury subpoena and subpoena by the Commodities Futures Trading Commission ("CFTC");(2) Qualls's direction to his attorney to provide false statements to the government in a July 22, 2003 letter in response to the grand jury subpoena; (3) Qualls's perjury during a deposition taken in connection with the CFTC civil action; (4) Qualls's direction to his attorney to provide false statements to the government in an August 6, 2003 letter in response to the grand

19

jury subpoena; and (5) Qualls's flight from justice during the course of his trial.

Because the obstruction enhancement pursuant to U.S.S.C. §3C1.1 arises based on a single instance of obstruction, the Guidelines calculation substantially understates the extent of Qualls's criminal conduct. In this regard, it should be noted that U.S.S.G. § 2J1.6, commentary note 4 provides that an upward departure may be warranted in such circumstances.  Indeed, without such a departure, Qualls's sentence may not sufficiently account for Qualls's bail jumping, as that conduct -- which formed the basis of a separate conviction after Qualls returned to the United States -- is not reflected in the Guidelines calculation.[10]  In any event, the circumstances presented here do not warrant a rejection of the Guidelines range as a matter of policy, and Qualls's application

---

[10]Moreover, Qualls also made numerous false statements to Postal Inspectors at the time of his arrest. These false statements, while not necessarily rising to the level of obstruction under the Guidelines, nonetheless provide support for a sentence at the high end of the Guidelines range. See U.S.S.G. § 3C1.1, commentary note 5 (noting that such conduct "may warrant a greater sentence within the otherwise applicable guideline range.").

for a below-Guidelines sentence on these grounds should be denied.

### D.   There is No Basis for a Downward Departure Based Upon Qualls's Mental Condition

Qualls next seeks a downward departure on the basis of his mental health condition.  [redacted]  This application lacks both a factual and legal basis, and should be denied.[11]

### 1.   The Court-Ordered Forensic Evaluations

[redacted]

### 3.   The Trial Record

Notwithstanding Dr. Drob's failure to do so, a review of the testimony presented at trial clearly demonstrates that Qualls was unaffected by any delusions during the commission of the crimes of conviction.  Indeed, the evidence at trial made clear that Qualls was fully aware of the nature and scope of his criminal conduct while he was committing the fraud.  During the course of the fraud, Qualls explained to Catalano that he disliked stop-losses because he found them difficult to use effectively, and therefore did not use stop-losses despite

---

[11] Qualls filed his sentencing submission under seal, on the basis that his submission contains mental health information relating to his downward departure application.  The government has therefore filed this portion of its sentencing submission under seal.

customer requests to do so.  (Tr. 997).  Yet Qualls promised investor Paul Mattarano that his investment at IFC would be protected by a stop-loss, and Qualls assured IFC brokers that he was using stop-losses whenever customers requested them.  (Tr. 46-47, 1261-62).  Qualls clearly understood the illegality of his failure to use stop-losses, as he told Papodoniou that IFC was legally required to implement stop-loss orders if customers requested them. (Tr. 1262).

Qualls also knew full well that he was stealing from his clients.  During the early days of IFC, Qualls had a lucky run of positive trading, netting profits for IFC investors. (Tr. 983, 1446).  Rather than dispense these gains to the clients, Qualls simply stole the money for himself and his co-conspirators.  (Tr. 983).  When questioned by Catalano, Qualls said that he would "make it up [to the clients] in future trades."  Id.

Rather than repay the investors the funds he had stolen, Qualls continued to steal more money from them, often by using the ATM card associated with the account holding investor funds.  Again, Qualls understood precisely what he was doing, as he would periodically call Catalano to tell him that Qualls

22

"just took cash out [of the client account] and I should do the same." (Tr. 984).

Similarly, Qualls also manifested a full understanding that he was not only stealing from his clients, but lying to his criminal co-conspirators as well. At one point during the scheme, Qualls took a larger share of money for himself and Catalano, while hiding this fact from Maggio and Hirschorn. Qualls justified this action to Catalano by claiming that Hirschorn and Maggio had "no way of finding out, and they'll be happy with [their share]." (Tr. 983).

Qualls also harbored no delusions about the consequences of his poor trading decisions. During one particularly disastrous series of trades, Maggio urged Qualls to cut IFC's losses by reversing a losing trade while there was still money left. (Tr. 1010). Qualls refused, saying IFC "[c]an't get out of it now because we'll lose all that money. Just have to hope [the trade] comes back around." (Tr. 1010). Of course, the trade did not "come back around" and IFC lost all of the investor funds.[12]

---

[12] Qualls also appeared quite clear-headed to family members during the time period of the fraud scheme. When questioned about a business transaction between Qualls and her husband,

This evidence thus fatally undermines Qualls's claim that delusions "caused him" to commit the crime.  Sent. Memo, at 1.  Qualls argues that he believed himself to be "a brilliant international money trader" who "truly believed he would be able to earn money for his clients and that he was treating them fairly."  Sent. Memo, at 14, 47.  Even assuming, arguendo, that Qualls genuinely believed he would be successful at profitably trading for his clients, that misguided belief cannot explain Qualls's falsification of client account statements, theft of client funds, and lies to clients concerning stop-losses and other details.

Qualls lamely asserts that the false account statements "were the products of [redacted]" because "[o]nly someone mentally ill would have thought that they could continue to make such representations over time."  Sent. Memo, at 22. Sadly, the federal reporters are filled with cases where victims were defrauded through the use of such fictitious account statements, from Bernie Madoff to smaller-scale Ponzi schemes. The perpetrators of such schemes are not mentally ill, but

---

Wetzel testified that Qualls was "quite aware of what he was doing and what my husband was doing."  (Tr. 705).

24

simply fraudsters who deceive their clients.  Indeed, we need not speculate in this regard, as Qualls acknowledged to Catalano that by sending the fictitious account statements to clients, Qualls was "committing a crime because they're false."  (Tr. 1019).

Qualls's obstructive conduct during the course of the investigation is further proof of his consciousness of guilt and the lack of any delusions regarding IFC.  Towards the end of the IFC scheme in July 2003, Qualls received a phone call in which he learned that law enforcement authorities were conducting a "search" of the IFC premises.  He became "very shaken" and "very upset" and ran from his house, telling his family that "the feds were coming, something to that effect, and he had to get to the office."  (Tr. 672, 688).[13]  Qualls succeeded in secreting a box containing IFC customer account statements, which he later hid in his mother-in-law's house.  (Tr. 677, 709).  After obtaining these documents, Qualls returned to dinner with his family, telling them that "he was relieved" because "he took care of things and he – he'd got there first."  (Tr. 673).

---

[13] In fact, law enforcement authorities were not executing a serach warrant, but instead had arrived at IFC offices to serve a subpoena on Qualls for documents relating to the fraudulent scheme.  (Tr. 717-718).

25

Critically, the phone call alerting Qualls of the
"search" represented the first time Qualls learned of any law
enforcement interest in IFC.  If Qualls truly believed that he
had not committed any wrongdoing at this time, he would not have
reacted in this manner.  Similarly, his secretion of customer
account statements belies any claim that he lacked an
understanding of the wrongfulness of his fraud.

    4.   Qualls's Current Mental Condition
           Does not Warrant a Downward Departure

Stripped of the specious claim that Qualls's mental
illness caused him to commit the crime, Qualls is left only with
the argument that his [redacted] warrants a downward departure.
This argument, however, is foreclosed by both the language of
the Guidelines and case law.[14]

       As the Second Circuit has explained,

> A trial court may exercise its discretion to
> grant a downward departure on the ground of
> diminished capacity if the defendant
> "committed the offense while suffering from
> a significantly reduced mental capacity."
> U.S.S.G. § 5K2.13. There must also be a
> causal link between the diminished capacity

---

[14] Although Qualls has characterized his application as a
downward departure under the Guidelines, any relief under
section 3553(a) on this basis is similarly unwarranted for the
reasons discussed above.

26

> and the charged offense. Id. The defendant
> must prove both of these elements by a
> preponderance of the evidence. See United
> States v. Gambino, 106 F.3d 1105, 1110 (2d
> Cir.1997). The Commentary Application Note
> for the Guideline defines "significantly
> reduced mental capacity" as meaning that
> "the defendant, although convicted, has a
> significantly impaired ability to (A)
> understand the wrongfulness of the behavior
> comprising the offense or to exercise the
> power of reason; or (B) control behavior
> that the defendant knows is wrongful."
> U.S.S.G. § 5K2.13, cmt. n. 1.

United States v. Valdez, 426 F.3d 178, 184 (2d Cir. 2005).

Where a defendant "fail[s] to establish sufficient causal link

between his condition and the offenses charged, there is no

factual basis for downward departure." United States v.

Malario, 164 F.3d 620 (2d Cir. 1998)(unpublished opinion)(citing

United States v. Piervinanzi, 23 F.3d 670, 684 (2d Cir. 1994).

The Valdez case is instructive here.  In Valdez, there

was no dispute that the defendant suffered from diminished

mental capacity and several psychological disorders.  Valdez,

426 F.3d at 181-82.  Nonetheless, the defendant was not entitled

to a downward departure, in light of his "extensive involvement

in the fraud, and defendant's ability to process complex

information." Id., at 185.  In affirming the district court's

denial of the downward departure motion, the Second Circuit

specifically relied upon the nature and scope of the defendant's criminal conduct:

> We do not think the district court's findings in this case were clearly erroneous because they were well supported by the record evidence. The district court explicitly recognized that appellant had emotional and mental impairments, and simply questioned whether those impairments were of such severity as to support a diminished capacity downward departure.  It concluded they were not.
>
> The determination that the impairment was not severe was validated by various pieces of proof, including the nature of the fraudulent scheme.  The scheme's complexity is manifested dramatically by the hundreds of written records kept by Valdez, proof that defendant was able to execute this fraudulent plan for a period of years by opening numerous accounts. . .

Valdez, 426 F.3d at 186.  See also e.g., United States v. Benson, 1993 WL 385213, *5 (4th Cir. Sept. 30, 1993)(unpublished opinion)(denying downward departure where defendant failed to prove that his mental condition was a contributing factor in his committing fraud, and noting that "the evidence indicates that he did not become 'mentally impaired' until after he began his bank fraud scheme.").

As in the cases cited above, there is simply no evidence of a causal link between Qualls's purported [redacted]

28

and the crimes of conviction.  Moreover, as in <u>Valdez</u>, the details of Qualls's crimes deeply undermine any claim that he was mentally impaired while committing the crimes of conviction.  As in <u>Valdez</u>, Qualls's crimes were "complex" and involved "hundreds of written records," including the IFC customer account statements which Qualls falsified.  Like the defendant in <u>Valdez</u>, Qualls executed the IFC scheme, along with the Oxford Dundee scheme, for "a period of years."  Indeed, Qualls's case is even starker than <u>Valdez</u>, as Qualls not only engaged in this complex criminal scheme but led it, supervising numerous co-conspirators as set forth above.  Such actions are entirely inconsistent with a diminished mental capacity.

In light of this record, there is no need for further exploration of Qualls's mental condition, and the Court should decline Qualls's request to hold a hearing on this issue. <u>See United States v. Slevin</u>, 106 F.3d 1086, 1091 (2d Cir. 1996) (the district court is not required by either the Due Process Clause or the federal Sentencing Guidelines to hold a full-blown evidentiary hearing in resolving sentencing disputes); <u>United States v. Prescott</u>, 920 F.2d 139, 144 (2d Cir. 1990)(district court has broad discretion to determine the procedures it will follow in resolving disputed sentencing factors).  Indeed, it is

unclear what purpose such a hearing would serve, as the most significant evidence of Qualls's mental state is already before the Court in the trial transcript.

In this regard, it is important to note that "a district court is not required to accept evidence concerning a defendant's mental and emotional states offered by defendant's own expert, but rather may rely on its own assessment of defendant's mental state based upon observations even when they conflict with those of the expert." Valdez, 426 F.3d at 186 (citing United States v. Leandre, 132 F.3d 796, 807 (D.C. Cir. 1998)).  Here, the Court has had ample opportunity to observe Qualls throughout the long history of this case, and to judge the demeanor and credibility of each witness who testified concerning Qualls's actions and mental state during the commission of the offenses.  Such a record provides a more than sufficient basis to deny Qualls's motion.

IV.   Section 3553(a) Factors

Consideration of the section 3553(a) factors, both individually and collectively, supports a sentence within the Guidelines range.

30

A.    <u>Nature and Circumstances of the Offense</u>

There can be little doubt that from the moment he first opened IFC, Qualls intended to defraud his clients and steal their money.  Indeed, Qualls began stealing from his clients in the very first month of IFC's existence, and continued doing so until he had exhausted all of the money, only to raise more funds and steal those as well.  Qualls committed this brazen fraud not because of any mental illness, but rather in the belief that he would never be caught.  This belief was well-founded, as neither the Oxford Dundee scheme nor the Evergreen scheme resulted in criminal charges against Qualls.

As discussed extensively above, Qualls was the central figure in the IFC scheme and, when it finally collapsed, undertook a nearly endless campaign to obstruct the investigation and prosecution of the criminal case against him. The most serious obstructive acts, including Qualls's secretion of the client account statements and his flight from justice, came dangerously close to effectively preventing his prosecution altogether.

Finally, and perhaps most significantly, Qualls caused extensive suffering among his victims, who continue to feel the effects of the crime today.  As noted above, Qualls's fraud has

31

caused far more than just financial harm. It has been "destructive, distressing, demoralizing as well as devastating" to his victims, causing both emotional and in some cases medical harm. <u>See</u> PSR, ¶¶ 57-58.

    B.   <u>History and Characteristics of the Defendant</u>

        The crimes for which Qualls was convicted represent the culmination of a long criminal history which stretches through all of Qualls's adult life. Qualls was first convicted for burglarizing a store at age 20. PSR, ¶112. Three years later, he committed credit card fraud, for which he was convicted of forgery. PSR, ¶ 112-13. Significantly, in a precursor of Qualls's conduct in the instate case, the state court issued several bench warrants for Qualls in connection with the forgery charge. PSR, ¶ 112. Qualls was arrested for a third time for an incident in which he punched a victim in the face and then fled from the police. PSR, ¶¶ 114-15. In 1998, Qualls was arrested for drunken driving, for which he received a conditional discharge. PSR, ¶ 116.

        As noted above, Qualls perpetrated two other foreign currency investment schemes, Oxford Dundee and Evergreen, for which he was never charged. Prior to that, Qualls participated in fraudulent chimney-cleaning scheme, but managed to extricate

himself shortly before his co-conspirators were arrested.  Thus, by the time of the IFC fraud, Qualls had already amassed an extensive criminal history.

Qualls's crimes continued after IFC.  In an eighteen month period between January 2005 and September 2006, Qualls was arrested three times, including an incident in which he pushed his wife into a wall.  PSR, ¶ 122.  When he was apprehended in Canada in 2009, Qualls was found to be using false identification documents in the name "Zachary Lyons."  PSR, ¶ 171.

In addition, Qualls's selfish actions in fleeing during this trial caused his elderly parents to forfeit their home.  Qualls attempts to put a positive spin on this crime, claiming that he "meant no harm" by fleeing, because his father encouraged him to flee, and the home was on a sinkhole and therefore worthless.  Sent. Memo, at 4, 10, Ex. D.  This argument exemplifies Qualls's deep failure to accept responsibility for his conduct.  Qualls, and not his parents, committed the crimes for which he was charged, and his decision to force them to bear responsibility for his actions is indefensible under any circumstances.  Unverifiable claims regarding his late father's wishes do not alter this analysis.

Regardless of the value of his house, Qualls's elderly parents faced the stress of a forced eviction from their home, as well as the financial burden of whatever amount of the $250,000 could not be satisfied through the sale of the "worthless" property.

Qualls's history and characteristics paint a grim picture for the court:  a man who has been committing fraud for literally his entire adult life; who sells out clients, co-conspirators and his own family members to serve his selfish interests; and who, even at this late hour, fails to take responsibility for his actions.

C.    Need to Reflect Seriousness of the Offense, Promote
      Respect for the Law and Provide Just Punishment_____

A sentence at the top of the Guidelines sentence, while significant, would best reflect the seriousness of Qualls's criminal conduct.  Far from an isolated incident, Qualls's scheme victimized numerous investors over an extended period of time, and represented the culmination of a successive series of similar fraudulent schemes.  Moreover, promoting respect for the law is a particularly important factor here, as Qualls's extensive obstructive conduct reflected his dogged attempts to undermine the law at every possible opportunity.  In

this regard, Qualls's proposed sentence of four years comes

nowhere close to reflecting the gravity of his offenses.

     D.    <u>Need to Avoid Unwarranted Sentencing Disparities</u>

        Qualls argues that a Guidelines sentence would create

an unwarranted sentencing disparity with "other frauds on a

similar scale." Sent. Memo, at 41. In support of his argument,

Qualls relies heavily on <u>United States v. Parris</u>, 573 F. Supp.2d

744 (E.D.N.Y. 2008), in which Judge Block imposed a sentence of

five years on defendants who had committed a $5 million "pump

and dump" securities fraud scheme. That case, however, involved

what Judge Block described as "a rather typical 'pump and dump'

scheme in the world of the high-risk penny stock investor." 573

F. Supp.2d at 746. Judge Block specifically noted that such a

case is "of a different character and magnitude" from cases in

which individuals "lost their pensions and were financially

ruined." <u>Id.</u>

        IFC investors were not "high risk" investors looking

to play the stock market, but rather were attracted to IFC

precisely because of Qualls's false promises of low risk, and

therefore often invested substantial portions of their savings.

The closer analogy, therefore, is not penny stock "pump and

dump" cases, but rather cases such as Bernie Madoff or <u>United</u>

35

States v. Philip Barry, 2012 WL 5476682 (2d Cir. Nov. 13, 2012) in which the defendants received sentences of life imprisonment and 20 years, respectively.

Qualls also cites to various statistics for federal fraud sentences, which he claims warrant a sentence of four years.  These statistics are of limited utility, as they represent mere averages among cases whose fact patterns necessarily vary widely.  Indeed, Qualls's case presents several aspects which are not present in the vast majority of fraud cases, including Qualls's prior, uncharged fraud schemes, obstructive conduct and bail jumping.

For similar reasons, Qualls's comparison with co-conspirator Hirschorn also fails.  Unlike Qualls, Hirschorn did not control IFC's assets or trading, did not prepare the false account statements and left the scheme relatively early.  As the government noted at Hirschorn's sentencing, Hirschorn received only $42,000, and, while he was aware that some investor funds were misapporpirated, there is no evidence that the defendant had knowledge of the wholesale nature of Qualls's theft of investor funds.  See United States v. Howard Hirschorn, 07-CR-268, Government Sentencing Submission, Docket Entry 15. Furthermore, Hirschorn pled guilty, and, rather than flee, self-

36

surrendered to prison.  Hirschorn is thus simply not comparable to Qualls.

E.    Need to Need to Afford Adequate Deterrence and Protect
      the Public from Future Crimes of the Defendant_____

In his sentencing memorandum, Qualls claims that he is essentially incapable of being deterred, but claims that "what he needs now" is to be released from prison.  Sent. Memo, at 2. This statement reflects a misunderstanding of the purposes of sentencing under section 3553(a).  As an initial matter, it is far from clear that Qualls is incapable of being deterred. Despite his extensive criminal history, which includes seven prior convictions, he never served more than a few months imprisonment for any crime.  There is some reason to hope that a sentence within the Guidelines range, which would provide Qualls with years to reflect upon his crimes and experience the consequences of his criminal conduct, will effectively deter Qualls from repeating his offenses.

Moreover, assuming Qualls is correct that he will never be deterred, the notion of an undeterred Thomas Qualls immediately returning to society is deeply disturbing.  Given his history, there can be little doubt that, if released in the near future, Qualls will return once again to his fraudulent

37

schemes, just as he did with Evergreen, then Oxford Dundee and finally with IFC.  The victim impact statements speak more eloquently than any legal brief could on the need to protect the public from future crimes of the defendant.  If nothing else, a sentence at the top of the Guidelines range will ensure that Qualls is unable to victimize anyone else for the next two decades.

Respectfully Submitted,

LORETTA E. LYNCH
United States Attorney


By:  /s/ Daniel Spector
Daniel A. Spector
Assistant U.S. Attorney
(718) 254-6345


cc: Zachary Margulis Ohnuma (by ECF, email and regular mail)
    USPO Cherly Fiorello (by email)