UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,                     :
                                              :
                                              :     **MEMORANDUM AND ORDER**
               -against-                      :     07-cr-14 (S-1) (DLI)
                                              :
THOMAS QUALLS,                                :
                                              :
                    Defendant.                :
------------------------------------------------------------x
UNITED STATES OF AMERICA,                     :
                                              :
                                              :     **MEMORANDUM AND ORDER**
               -against-                      :     09-cr-418 (DLI)
                                              :
THOMAS QUALLS,                                :
                                              :
                    Defendant.                :
------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

On November 5, 2008, defendant Thomas Qualls ("Defendant") was found guilty by jury verdict on Count One, Conspiracy to Commit Mail and Wire Fraud, Count Two, Mail Fraud, Counts Three through Fourteen, Wire Fraud, Counts Eighteen and Nineteen, Obstruction of Justice, of a superseding indictment. (Violations of 18 U.S.C. §§ 1349, 1341, 1343, 1512(c)(1), and 1512(c)(2), respectively.) On April 4, 2013, Defendant pled guilty to one count of failure to appear in court as required by the conditions of his release in violation of 18 U.S.C. §§ 3146(a)(1), (b)(1)(A)(i), and (b)(2), based upon his flight to Canada on the day closing arguments were to be made at his trial. Defendant was arrested in Canada on March 17, 2009 and extradited to this district on July 23, 2012.

In preparation for sentencing, Defendant objected to: (1) the Probation Department's determination that victims' losses were over $400,000 and application of the resulting 14-point

offense level enhancement pursuant to United States Sentencing Guideline ("U.S.S.G." or "Guidelines") § 2B1.1(b)(1)(H); (2) the application of the sophisticated means enhancement under U.S.S.G. § 2B1.1(b)(10); (3) the application of the organizer-leader enhancement under U.S.S.G. § 3B1.1(a); and (4) the application of the 2012 U.S. Sentencing Guidelines Manual ("Guidelines Manual") in connection with the four-point commodities trade enhancement, as an *ex post facto* violation. (Objection to Presentence Investigation Report ("Obj. to PSR") at 2-3, Dkt. Entry No. 218.).[1] Additionally, Defendant sought a *Fatico* hearing to present evidence to support his claim that he should receive a downward departure pursuant to § 5K2.13 based on an alleged delusional disorder that purportedly caused him to have diminished mental capacity at the time he committed the offense. (Def.'s Motion for Hrg., Dkt. Entry No. 232.)[2] The government and the Probation Department ("Probation") opposed Defendant's objections emphasizing Defendant's role in the scheme, the evidence adduced at trial, and the date of the actual sentencing. Substantial briefing by the parties on these issues was entertained by the Court.

On March 7, 2014, the Court held a sentencing hearing. As an initial matter, the Court adopted the Guidelines total offense level of 35 with a Criminal History Category of III recommended by the Probation Department, which corresponds to a Guidelines sentence range of 210-262 months' imprisonment. (*See* Sent. Tr. 16:13-16:21, Dkt. Entry No. 245.) In calculating the offense level, the Court held, over the objections of Defendant, that Defendant's conduct warranted a 14-point offense level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(H)

---

[1] Citations to the record are from case number 07-cr-14 (S-1), unless otherwise noted.
[2] Defendant raised this claim only in connection with sentencing. As discussed further *infra*, Defendant did not interpose any psychiatric defense at his trial or allege that he was incompetent to stand trial during trial or any pretrial proceedings. It was not until September 12, 2012, that defense counsel requested a psychiatric examination of Defendant be performed, *see* Dkt. Entry Nos. 200-01, which application the Court granted. *See* Dkt. Entry No. 203.

because Defendant caused losses greater than $400,000 but less than $1 million, as well as an enhancement for sophisticated means and his leadership role and denied a downward departure pursuant to U.S.S.G. § 5K2.13 for diminished mental capacity during the commission of the fraud scheme here.

The Court also heard arguments from defense counsel and the government, as well as statements from Defendant in connection with factors they sought the Court to consider in fashioning a reasonable sentence. After taking into account the parsimony clause of and the factors listed in 18 U.S.C. § 3553(a), the Court determined that a sentence within the Guidelines range was appropriate. Specifically, the Court imposed a sentence of 150 months' imprisonment for each count under 07-cr-14 (S-1), to run concurrently with each other, plus three years' supervised release on each count to run concurrently with each other. As to the conviction for failure to appear in 09-cr-418, the Court imposed a sentence of 60 months' imprisonment plus three years' supervised release to run consecutively to the sentences imposed under Case Number 07-CR-14(S-1). The Court held, *inter alia*, that such sentences were sufficient but not greater than necessary to satisfy the purposes of Section 3553(a).

As detailed below, the Court finds that: (1) the proper calculation of the victims' losses requires a 14-point offense level enhancement; (2) application of the sophisticated means and leadership role enhancements is appropriate, and (3) application of the 2013 Guidelines Manual does not violate the *ex post facto* clause. Additionally, for the reasons set forth below, Defendant's request for a *Fatico* hearing to present additional evidence regarding whether the offenses were committed while Defendant was suffering from a significantly reduced mental capacity is denied and the Court finds that a departure from the Sentencing Guidelines range on that basis is not warranted.

# BACKGROUND[3]

Between 2001 and 2003, Defendant was a principal of International Foreign Currency, Inc. ("IFC") and served as its president and treasurer. (Revised Presentence Investigation Report ("PSR") ¶ 13, Dkt. Entry No. 216.)[4] IFC was a firm that claimed to invest in the foreign currency exchange market for investors. Cold callers, at the direction of Defendant, used materially false information to induce customers to invest in IFC. (PSR ¶ 4.) Also at the direction of Defendant, investors were sent marketing materials for IFC that included false information. (*Id.*) Not only was investor money lost during the scheme, Defendant also stole investors' money by withdrawing money from the investor account for personal use. (*Id.*)

Defendant attempted to cover up the fraud and theft using various methods, including preparing falsified monthly statements that were faxed or mailed to investors, lying during a deposition before the United States Commodity Futures Trading Commission, and hiding documents at his mother-in-law's house. (*Id.*)

The Court held a four-week trial in *United States v. Qualls*, No. 07-cr-14. (PSR ¶ 5.) The trial included expert testimony, as well as testimony from cooperating fact witnesses. (*Id.*) A jury found Defendant guilty on sixteen counts of a nineteen-count superseding indictment. (*Id.*) In addition, on November 6, 2008, the jury returned a separate special verdict finding that the amount of loss to the victims as a result of this fraud scheme for forfeiture purposes was $922,382.00.

---

[3] The Court assumes the parties' familiarity with the facts of this case. Only those facts necessary to explain the Court's decision are recounted herein.

[4] Probation issued the original Presentence Report on November 5, 2012. It issued a Revised Presentence Report on May 9, 2013. Defendant made no objections to the original Presentence Report. Instead, defense counsel sought the psychiatric evaluation of Defendant. The objections made by Defendant are to the Revised Presentence Report. All references to "PSR" are to the Revised Presentence Report of May 9, 2013. In addition, at the time of sentence, the applicable sentencing Guidelines Manual in effect was the 2013 Guidelines Manual. However, the analysis remains unchanged.

Defendant had absconded just prior to the commencement of closing arguments for case number 07-cr-14. (PSR ¶ 6.) A warrant was issued for his arrest and he was ultimately located and arrested on March 17, 2009 in Montreal, Canada. (*Id.*) He was extradited to the United States on July 27, 2012. (*Id.*) Defendant subsequently pled guilty to an indictment charging him with failure to appear and was sentenced for both cases on March 7, 2014.

## DISCUSSION

I. **Loss Amount**

In determining Defendant's total offense level under the Guidelines, Probation applied a 14-point offense level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(H), because it determined the victims' losses were more than $400,000 but less than $1 million. (*See* PSR ¶ 76.)

Defendant objected to this calculation, asserting that the losses were $367,946.16, and, therefore, a 12-point offense level enhancement applied. (*See* Def.'s Sent. Mem. 21, Dkt. Entry No. 227.) Specifically, Defendant argued that the Probation Department's loss calculation improperly included two deposits totaling $450,000 that the government had not provided adequate information about. (*Id.*) The government countered that the evidence adduced "at trial established that the only purpose for which funds were provided to IFC by investors was for foreign currency investment" and that an account statement for Roger Steele's company, Impetus, was introduced at trial that showed an opening balance of $350,000 (Gov't Sent. Mem. 7-8, Dkt. Entry No. 230.)

The Court adopts Probation's final loss calculation of over $400,000, because there was sufficient evidence adduced during trial to establish by more than a preponderance of the evidence that all deposits were part of the scheme to defraud and both the $350,000 transfer from

5

Roger Steele and the $100,000 transfer from Alexander Perumal were deposited into IFC's accounts during the scheme. (*See, e.g.*, Gov't Trial Ex. 71C.) The Court also notes that, while Defendant has objected to inclusion of these two deposits for the loss calculation, he has not rebutted the government's assertion that these amounts were from Roger Steele and Alexander Perumal or that the amounts were somehow different than all the other funds that the evidence has shown were obtained as part of the scheme. Additionally, the Court is mindful of the forfeiture determination that was made by the jury, which found by a preponderance of the evidence, that the proceeds of the illegal activity were $922,382.00. (Jury Verdict Form, Dkt. Entry No. 155.) There was testimony at trial that summed up the money fraudulently taken from investors. Ms. Wendy Spaulding, an expert forensic accountant who testified for the prosecution, explained, if the investors deposited $922,382 and withdrew $107,000, the amount of money not returned to investors totals approximately $814,733. (Trial Tr. 1648:13-1648:20.) This calculation tracks the amount provided in the PSR, $817,948.16, which took into account those investors who did not incur a loss. (PSR ¶ 62.)

Under the advisory Guidelines, the offense level is increased by 14-points if the victims' loss amount is over $400,000 and less than $1 million. U.S.S.G. § 2B1.1(b)(1)(H). In determining the loss amount, the sentencing court "need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1, application n.3(C); *see also United States v. Rigas*, 583 F. 3d 108, 120 (2d Cir. 2009). Based on the ample evidence adduced at trial, the Court finds that the 14-point offense level enhancement is appropriate under U.S.S.G. § 2B1.1(b)(1)(H).

## II. Application of the Sophisticated Means Enhancement

Defendant claims that the methods used to perpetrate the fraud were naïve and unsophisticated, and argues that the fraudulent account statements contained errors that investors

could easily identify on their face. (Def.'s Sent. Mem. 22.) The government responds that, since investors did not have access to IG's[5] trading accounts, the account statements were the only method to determine amounts in their IFC accounts. Additionally, the government notes that at least two victims relied on the information in the fictitious statements to increase their investment. (Gov't Sent. Mem. 8-9.)

The Guidelines provide that the sophisticated means enhancement applies in cases that involve "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1, application n.9(B). The application notes provide two examples of sophisticated means: (1) a telemarketing scheme that has a main office in one jurisdiction and the operations in another jurisdiction; and (2) hiding assets or transactions using fictitious entities, corporate shells, or offshore accounts. *Id.*

This case involved: (1) creating and disseminating marketing materials that contained material misrepresentations (Trial Tr. 548:8-551:13, 552:16-554:10); (2) ongoing wrong doing that lasted several years and was honed by past practices by Defendant along with others at different entities that engaged in similar schemes (*id.* at 520:8-520:12, 537:17-537:22, 551:20-552:15); (3) cold-calling of potential investors using carefully drafted scripts designed to hook them into the fraud (*id.* at 532:4-534:11); (4) lying to employees (*id.* at 520:2-520:7) and investors (*see, e.g.*, *id.* at 393:1-393:13) in a careful effort to conceal the fraud; and (5) creating fictitious account statement documents (*id.* at 539:11-540:6) to entice further investment and/or deter the withdrawal of previous investments. The Second Circuit has approved the application of the sophisticated means enhancement in cases where similar means were used to carry out the fraud schemes. *See, e.g.*, *United States v. Stitsky*, 2013 WL 5645563, *11 (2d Cir. Oct. 17,

---

[5] IG was the United Kingdom entity through which the Defendant claimed to be trading in the spot foreign currency market.

2013); *United States v. Regensberg*, 381 F. App'x 60, 60 (2d Cir. 2010). While Defendant claims there were obvious errors in the fraudulent statements, even the expert witness, a forensic accountant, noted that it took "a lot" of time to try to decipher the information in the fake statements prepared by the Defendant. (Trial Tr. 1595:3-1595:5.) Doing so required cross referencing other sources of information, not necessarily readily available to the investors. (*Id.* at 1596:4-1596:17.) The Court notes further that, "even if each step in the scheme was not elaborate, the total scheme was sophisticated in the way all the steps were linked together." *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003).

Therefore, application of the sophisticated means enhancement is appropriate to determine the proper Sentencing Guidelines range.

### III. Application of the Leadership Role Enhancement

To determine whether a defendant was an organizer or leader of a criminal activity courts consider:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, application n.4. The note states further that "[t]here can, of course, be more than one person who qualifies as a leader or organizer . . . ." *Id.*

In this case, Defendant exercised ultimate decision making authority about trading investor funds and the steps and methods to be used to effectuate such a trade. (Trial Tr. 538:21-538:25, 551:11-551:13, 1257, 1381.) While there was testimony regarding some trades that were made by others, these other individuals always acted at the direction and discretion of Defendant. (*Id.* at 1181.) He had such control over the illegal enterprise that no one could even see the

account statements, unless he allowed it. (*Id.* at 72.) He used his knowledge from his prior experience with fraudulent schemes such as Evergreen International Inc.[6] to collaborate with other members to perpetrate this fraud. (*See, e.g.*, *id.* at 551:20-552:15.) Notably, when something did not go according to plan or an investor tried to back out, it was the Defendant who would talk to the victim and assure the victim that he, as the president and owner of the company, not only had the situation under control, but would protect the investor's interests. Defendant also was involved in the scheme throughout the entire life of the activity, unlike other actors, who came and went – Defendant always was involved. (*Id.* at 1260:20-1261:17.) Additionally, Defendant directed participants about when and how much money they could take. (*Id.* at 984:9-984:15.) He would take some for himself, allow others to take some and even went so far as to tell a participant that Defendant and the participant could take more than other participants because they would never know. (*Id.* at 983:3-983:12.) Finally, he even was referred to by the IFC workers as the "ultimate boss." (*Id.* at 1256:15-1256:16; *see also id.* at 47:4-47:6 (referring to Defendant as "boss").)

The evidence adduced at trial showed that Defendant, initially an organizer, was the leader of the criminal enterprise. Based on his level of participation and the number of participants (five or more), a four-point enhancement is applicable under the Sentencing Guidelines pursuant to § 3B1.1(a).

## IV. Applicable Guidelines Manual and Application of the *Ex Post Facto* Clause

The Guidelines Manual specifically addresses which manual to apply when sentencing a defendant. It provides:

> (a) The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.

---

[6] A criminal prosecution as a result of the Ponzi scheme carried out by Evergreen was filed in this district under *United States v. Evergreen International, et al.*, 01-CR-1243 (CBA).

>(b)(1) If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the *ex post facto* clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed.

U.S.S.G. § 1B1.11.[7] The Guidelines Manual further provides that the relevant manual must be applied in its entirety, not piecemeal, even if multiple offenses are committed. U.S.S.G. § 1B1.11(b)(2), (3) (the "one-book rule"). Moreover, where defendant commits an offense after the initial offense of conviction, the Guidelines Manual in effect at the time of the later offense is used. U.S.S.G. § 1B1.11(b)(3).

The Second Circuit has explained that, "[f]or a law to contravene the *Ex Post Facto* clause, 'two critical elements must be present: First, the law must be retrospective, that is, it must apply to events occurring before its enactment; and second, it must disadvantage the offender affected by it.'" *U.S. v. Kumar*, 617 F.3d 612, 625 (2d Cir. 2010) (quoting *Miller v. Florida*, 482 U.S. 423, 430 (1987)).

Defendant contends that application of the current Guidelines Manual violates the *ex post facto* clause because his "criminal activity ended in the summer of 2003" and the enhancement for violation of a commodities law was not promulgated until after that time. (Def.'s Sent. Mem. 20.) He suggests that the 2002 Guidelines Manual applies instead. (*Id.*)[8]

In this case, as in *Kumar*, there is no question that that application of the 2013 Guidelines Manual disadvantages Defendant by subjecting him to a higher Guidelines range than would have applied if the 2002 Manual were in effect. Therefore, the remaining question is whether

---

[7] All citations to the United States Sentencing Guidelines Manual refer to the 2013 version that became effective November 1, 2013, unless otherwise noted, as it was the one in effect at the time of sentencing.
[8] The government initially joined in this defense objection, but differed with Defendant's calculation in arguing that since the commodities trade enhancement did not apply a three-point enhancement for abuse of trust applies pursuant to U.S.S.G. § 3B1.3.

10

application of the current manual due to Defendant's later commission of an offense violates the "retrospective" prong of the *ex post facto* test.

The Second Circuit squarely addressed this issue in *Kumar*. In *Kumar*, the court held "that the one-book rule set forth in § 1B1.11(b)(3) does not violate the *Ex Post Facto* clause when applied to the sentencing of offenses committed both before and after the publication of a revised version of the Guidelines." *Kumar*, 617 F.3d at 628. The court further held "that the adoption of the one-book rule prior to the commission of the defendants' [second] offense had placed them on notice of the consequences of committing that second offense." *Id.*[9]

Defendant attempts to distinguish *Kumar* from the present case by arguing that the bail jumping offense is a completely separate offense, based on timing and type, which cannot be grouped with the original fraud offense. However, *Kumar* did not rely on the fact that the defendants' offenses could be grouped, but rather on whether the defendants were on notice. The Second Circuit explained, "[t]he existence of an *ex post facto* violation turns on whether an individual was deprived of fair notice, 'not [on] an individual's right to less punishment.'" *Id.* (quoting *Weaver v. Graham*, 450 U.S. 24, 30 (1981)). Additionally, the commentary for the Guidelines Manual belies this distinction as well. It provides:

> the approach set forth in subsection (b)(3) should be followed regardless of whether the offenses of conviction are the type in which the conduct is grouped . . . . The *ex post facto* clause does not distinguish between groupable and nongroupable offenses, and unless that clause would be violated, Congress's directive to apply the sentencing guidelines in effect at the time is determined based on the defendant's overall conduct, even if there are multiple counts of conviction.

U.S.S.G. § 1B1.11, cmt. background at 44.

---

[9] The Court notes that U.S.S.G. § 1B1.11(b)(3) was in effect in the 2002 Manual as well.

Similarly, Defendant's reliance on *Peugh v. United States*, 133 S. Ct. 2072 (2013) and *Alleyne v. United States*, 133 S. Ct. 2151 (2013), is misplaced. In *Peugh*, the Supreme Court addressed whether the advisory nature of the Guidelines post-*Booker* avoided any potential *ex post facto* clause violation. *Peugh*, 133 S. Ct. at 2081. *Peugh* did not address whether application of the one-book rule violated the *ex post facto* clause. Further, the Court in *Alleyne* addressed whether a fact found by the court increased the mandatory minimum, which is not at issue in this case.

Here, the Defendant committed the crime of failure to appear in Court as required, during trial of the original offenses. He was aware that doing so would subject him to additional criminal liability and punishment and, yet, he elected to flee and remain a fugitive for almost a year. Thereafter, he exercised various avenues in the Canadian courts to fight extradition to this country, which took nearly four years to terminate. The 2013 Guidelines Manual is the applicable manual and its application does not violate the *ex post facto* clause.

**V.    Requests to Vary from Guidelines Range**

Defendant's request for a *Fatico* hearing to support his claims regarding his mental capacity and for a downward departure from the Guidelines range based on his mental capacity are denied for the reasons set forth below. Additionally, his request for a downward variance from the applicable Guidelines range based on a sentencing policy disagreement and avoiding unwarranted sentencing disparities among codefendants is denied for the reasons set forth below.

*A.    Diminished Mental Capacity*

1.    Necessity of a *Fatico* Hearing

Defendant requested a *Fatico* hearing to bolster his argument that his diminished mental capacity warranted a downward departure from the applicable Guidelines range pursuant to

§ 5K2.13. Defendant claims that a *Fatico* hearing is required because the government disputes the credibility of Dr. Sanford Drob, the doctor that created the report detailing the duration of Defendant's mental illness.

Sentencing courts have broad discretion to determine how to deal with disputes that arise during sentencing. *United States v. Preston*, 499 F. App'x 70, 74 (2d Cir. 2012); *see also United States v. Slevin*, 106 F.3d 1086, 1091 (2d Cir. 1996). "The district court is not required, by either the Due Process Clause or the federal Sentencing Guidelines, to hold a full-blown evidentiary hearing in resolving sentencing disputes." *Slevin*, 106 F.3d at 1091; *United States v. Vassar*, 2013 WL 5629784, *1 (2d Cir. Oct. 16, 2013) ("A criminal defendant has no right to demand an evidentiary hearing to present his own witnesses at sentencing . . . ." (quotation omitted)). Instead, the court must only "afford the defendant some opportunity to rebut the Government's allegations." *Preston*, 499 F. App'x at 74 (quotation omitted) (finding district court did not abuse its discretion when it denied request for hearing and that counsel's written and oral challenge provided a sufficient opportunity to rebut even in the absence of a "full-blown hearing").

The Court had the opportunity to observe Defendant in court for over one year during pretrial proceedings and during the four-week trial. The Defendant actively participated in his defense, conferring with counsel at every stage. Notably, neither his earlier retained attorney, an experienced federal practitioner, nor his appointed counsel[10] ever raised any issues concerning Defendant's mental health generally or his competence to stand trial. In this case, there is not only an extensive trial record, which Defendant had the opportunity to develop since he was present and participated until closing arguments, but also extensive written submissions and

---

[10] The same counsel, appointed pursuant to the Criminal Justice Act, represented Defendant at pre-trial, trial, and the sentencing proceedings.

arguments from counsel regarding Defendant's capacity. Thus, the Court found that testimony from Dr. Drob was unnecessary for the Court to properly exercise its authority to determine whether Defendant was suffering from a significantly reduced mental capacity at the time of the offenses.

2. Denial of Departure for Diminished Mental Capacity

Defendant argues that he was entitled to a reduction pursuant to § 5K2.13. Defendant relied on Dr. Drob's diagnosis of his delusional disorder. After considering the evidence adduced at trial, the Court's own interactions with Defendant while in Court, the multiple psychological reports, and the parties' submissions and arguments, the Court finds that a downward departure is not appropriate in this case.

While Defendant has been diagnosed as having a mental illness, i.e. delusional disorder, no causal link has been established between his alleged diminished mental capacity and the commission of the crimes. In fact, based on the record, it is abundantly clear that Defendant knew what he was doing during the commission of the fraud scheme. As discussed in Section III above, Defendant was the leader and organizer of the mail and wire fraud scheme here. It was he who designed the materially misleading brochures for IFC to entice investors to turn over their life savings, college funds and retirement accounts, and the false account statements. He supervised over five individuals during the life of the scheme and exercised authority over the disbursement of funds. Many of the witnesses who testified to directly dealing with Defendant, as either investors or employees, stated that he was the person in control, and at no time did they indicate that Defendant appeared delusional or not in control of all his faculties. Defendant went about committing this fraud scheme in a calculated and measured manner. For example, by obstructing justice and hiding evidence, it was evident he understood he had criminal liability

14

and what documentary evidence would prove it.  Similarly, when Defendant absconded after the presentation of witnesses and evidence concluded, it is apparent that he not only understood his wrong doing, but also the consequences and the certainty of punishment.  The evidence against Defendant was overwhelming.

Additionally, Defendant discussed the illegality of his actions with others during the course of the scheme.  For example, Joseph Catalano testified that he spoke to Defendant about sending inaccurate account statements to clients and that Defendant told him, "If we sent the statements out, we would be committing a crime because they're false."  (Trial Tr. 1019:20-1019:25.)  Defendant also told Postal Inspector Sara Levinson that he left Evergreen International because "[h]e thought that they were committing illegal practices . . . ."  (*Id.* at 773:23-773:24.)  Yet, there was testimony throughout the trial as to the similarities between the modus operandi of Evergreen International and IFC.  (*See, e.g.*, *id.* at 520:8-520:12, 537:17-537:22.)  These types of statements, combined with his actions during the course of the fraudulent scheme and throughout the course of the trial, evidence that his delusional disorder did not impact his culpability in a way that requires this Court to disregard the Guidelines range in favor of a downward departure.

This analysis is consistent with the psychological reports that indicate that he has the ability to compartmentalize his delusions.  As noted by the forensic psychologist, William Ryan, Defendant's delusions were localized and thematic.  (Psychiatric Report 12, Dkt. Entry No. 215.)  His delusions are generally centered around his involvement in asset recovery.  (*Id.*)  This type of localized delusion, according to the report, is consistent with the disorder and may not impact Defendant's functioning.  (*Id.*)

Further, while Dr. Drob was tasked with determining how long Defendant was affected by his mental illness, his assessments were made recently, during the sentencing phase, and relied upon self-serving statements of Defendant and his family members.[11] Thus, while the Court acknowledges that Defendant suffers from a mental illness, and has taken that into account in determining the appropriate sentence to impose, the Court finds that a causal link has not been established and a departure is not appropriate.

In addition to the lack of causal link, the Court notes that § 5K2.13 specifically prohibits a departure if "the defendant's criminal history indicates a need to incarcerate the defendant to protect the public." This is relevant in this case as Defendant has engaged in other conduct to defraud the public and commit crimes. Prior to the IFC scheme, he changed business models and entities when regulators started to question his practices. As noted in footnote 10 above, Defendant used a false identity to enter Canada and then to work and live there with his wife. These evasive maneuvers used to continue to perpetrate fraud and evade capture indicate that incarceration is necessary, and that a departure is not appropriate.

B. *Policy Disagreement*

Defendant argues that the Court should reject the Guidelines range as a matter of policy because the ranges were "unjustifiably increased" and his criminal culpability is therefore overstated. (Def.'s Sent. Mem. 29.) He claims that the inflated ranges based on fraud were not increased based on empirical data or national experience. (*Id.* at 33.) In response to this argument, the government emphasizes the seriousness of the impact of Defendant's fraudulent actions, as well as the underrepresentation of some of his prior criminal activity under the

---

[11] Notably, the family members, concededly, were complicit in helping Defendant abscond to Canada where he later lived and worked under an assumed identity with his wife.

Guidelines range. In light of the facts and circumstances of this case, the Court is not persuaded by Defendant's policy argument.

"A district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines . . . ." *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (citing *Kimbrough v. U.S.*, 552 U.S. 85 (2007)). This option allows a court to consider whether the Sentencing Commission has exercised its "characteristic institutional role" to establish a sentencing range that is based on "special expertise, study, and national experience." *Id.* at 192, n.9 (quotation omitted).

While some courts contend that the increases in the recommended Guidelines sentences in securities fraud cases due to increased enhancements based on loss amounts are a "draconian approach to white collar crime, unsupported by any empirical data," *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), § 3553(a) requires an individualized assessment of each case on its facts. Critical to this Court's assessment of the facts was that the loss amount neared the top of the range for this level of enhancement – this was not a case with loss amounts of $400,001. Similarly, the 14-point enhancement falls in the mid-range of the enhancements for this conduct, which can require enhancements of more than double the level here. Given the nature of the victims, the amount of loss here, as well as the impact of the loss on the victims, the Court finds that the enhancement is appropriate.

Here, the Court has focused on the level of harm caused by the Defendant's actions and the nature of the victims, as well as the conduct and participation of Defendant. There are no mitigating factors present at all, much less to a degree that would warrant a variance based on a policy disagreement. The Guidelines do not cause an unduly harsh result in this case. This case is distinguishable from the cases where courts have varied from the Guidelines due to policy

considerations. For example, in *United States v. Collins*, No. 07 CR 1170 (LAP) (S.D.N.Y. July 15, 2013), the Honorable Loretta A. Preska, Chief Judge of the Southern District of New York, varied from the Guidelines in a case where the loss figures were in the billions. The court emphasized that Collins was "a certifiable saint." Sent. Tr. 22:19, No. 07 CR 1170 (LAP), Dkt. Entry No. 244. The court detailed the charitable acts of the defendant throughout his life and also explained that the defendant was a unique fraud defendant because he did not seek to benefit directly from the fraud (indeed he benefitted little) or in any way organize the fraud. *Id.* at 29:3-30:11. Similarly, while the loss amount was over $5 million and the enhancement was 18 points in *Gupta*, the court emphasized Defendant's good deeds and lack of personal gain during the insider trading scheme. 904 F. Supp. 2d at 351, 353-54 (noting that the court "has never encountered a defendant whose prior history suggests such an extraordinary devotion, not only to humanity writ large, but also to individual human beings in their times of need"). *Collins*, *Gupta* and cases like them highlight the stark contrast between Defendant's actions and others who have received a downward variance. Defendant has committed crimes and fraudulent schemes throughout his life. Defendant led, organized, and orchestrated this scheme. Defendant directly and purposefully profited from the scheme, obstructed justice to avoid detection of the scheme, involving his family members in doing so, and then fled to avoid punishment using a false identity to cross the Canadian border and obtain a job and home there. Notably, his elderly parents lost their home, which they posted as security for his bond. Variance under these circumstances is not appropriate.

Thus, while the Court acknowledges that there are instances where deviation due to a policy disagreement may be warranted, *see, e.g.*, *Collins*, No. 07 CR 1170 (LAP) (S.D.N.Y. July

15, 2013); *United States v. Bannister*, 786 F. Supp. 2d 617 (E.D.N.Y. 2011) (noting disparities created by crack cocaine sentencing guidelines), the Court finds that this is not such a case.

        *C.*        *Avoiding Unwarranted Sentencing Disparities*

Defendant also requested a reduced sentence because he claims that to impose a Guidelines range sentence would result in an unreasonable disparity among codefendants. However, the Court notes that the defendants here had varying degrees of culpability, as well as starkly different levels of cooperation that warranted individual, varied sentences. *United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006); *see also United States v. Ghailani*, 733 F.3d 29, 55 (2d Cir. 2013) (explaining that a district court must consider national disparities, not disparities between codefendants). Defendant Qualls did not cooperate at all in his underlying trial, but rather hid evidence, and fled the country to avoid prosecution. Additionally, while Defendant attempted to shift responsibility for the scheme to codefendants during the trial, witnesses repeatedly stated that Qualls was the one actually in charge. Defendant's attempts to challenge the credibility of the government's witnesses fail because such credibility determinations by the jury are given great deference. *See, e.g.*, *United States v. Henareh*, 2014 WL 1642408, at *1 (2d Cir. Apr. 25, 2014) (noting deference to jury determinations in context of sufficiency of the evidence challenge). Moreover, this Court presided over the trial and found, as did the jury, that the government's witnesses were credible. As such, a variance to avoid unwarranted sentencing disparities is not appropriate in this case and Defendant's request for a downward variance on this ground is denied.

## CONCLUSION

For the foregoing reasons, Defendant's conduct warrants a four-point offense level commodities trading adviser enhancement pursuant to U.S.S.G. § 2B1.1(b)(18), a two-point

offense level sophisticated means enhancement pursuant to U.S.S.G. § 2B1.1(b)(10), a four-point leadership role enhancement pursuant to U.S.S.G. § 3B1.1(a), and a 14-point offense level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(H). Additionally, the Court finds that application of the 2013 Guidelines Manual does not violate the *ex post facto* clause in this case and that a *Fatico* hearing to adduce further evidence regarding Defendant's mental capacity is unwarranted. Defendant's other arguments in support of a downward variance are without merit.

SO ORDERED.

DATED: Brooklyn, New York
June 6, 2014

_____/s/_____
DORA L. IRIZARRY
United States District Judge